# EXHIBIT A-2

CASE NO._____ 2024-05-35552-CV -

CELIA MARTINEZ GONZALEZ, and
ROLANDO VALLE REYES

       **Plaintiffs,**

  v.

DANIEL DEFENSE, LLC A/K/A DANIEL
DEFENSE, INC.; DANIEL DEFENSE
HOLDINGS, LLC; M.C. DANIEL GROUP,
INC.; FIREQUEST INTERNATIONAL, INC.;
FLASH CO., INC.; EOTECH, LLC; PROJECT
ECHO HOLDINGS, LLC D/B/A AMERICAN
HOLOPTICS; and OASIS OUTBACK, LLC.

       **Defendants.**

IN THE DISTRICT COURT OF

UVALDE COUNTY, TEXAS

_____ **38th** _____ **JUDICIAL DISTRICT**

**PLAINTIFFS' PETITION FOR
DAMAGES**

  (1) Negligence

  (2) Negligent Transfer

  (3) Intentional Infliction of Emotional
    Distress

  (4) Nuisance

  (5) Unjust Enrichment

  (6) Punitive / Exemplary Damages

1
PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ............................................................................. 4

I.  DISCOVERY LEVEL ................................................................ 5

II.  JURISDICTION AND VENUE ................................................ 5

III.  THE PARTIES......................................................................... 5

    A.  THE DEFENDANTS ........................................................ 5

IV.  GENERAL ALLEGATIONS ................................................... 9

    A.  Gun Violence In America ................................................ 9

    B.  Most School Shooters Are Young Adult Males ............ 14

    C.  Onset Of Mental Illness In Young Adults.................... 15

V.  STATEMENT OF FACTS ....................................................... 16

    A.  Uvalde, Texas................................................................ 16

    B.  Celia Martinez Gonzalez, Victim of Gun Violence ..... 17

    C.  The Shooter.................................................................... 19

    D.  The Gun Maker – Daniel Defense ............................... 26

    1.  *Daniel Defense Aggressively Markets to Untrained Civilians and Young Adults Using Deceptive and Unfair Advertising.* ................................. 27

    2.  *Daniel Defense Knows Their Weapons Are Used in Mass Shootings.* ......................... 33

    E.  The School Shooting On May 24, 2022 ....................... 36

    F.  *The Gun Defendants Are Not Shielded By The Protection Of Lawful Commerce In Arms Act ("PLCAA") Because They Violated Federal Laws.* ....................................... 48

VI.  FIRST CAUSE OF ACTION: NEGLIGENCE ..................... 50

VII.  SECOND CAUSE OF ACTION:  NEGLIGENT TRANSFER................................. 55

VIII.  THIRD CAUSE OF ACTION:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ................................................................. 57

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

IX.    **FOURTH CAUSE OF ACTION:  NUISSANCE** ........................................................... **58**

X.     **FIFTH CAUSE OF ACTION: UNJUST ENRICHMENT** ......................................... **61**

XI.    **PUNITIVE/EXEMPLARY DAMAGES** ........................................................................... **62**

XII.   **RELIEF SOUGHT** ................................................................................................................. **62**

XIII.  **DEMAND FOR JURY TRIAL** ........................................................................................... **63**

XIV.   **SPOLIATION** ........................................................................................................................... **63**

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

COMES NOW Plaintiffs, CELIA MARTINEZ GONZALEZ, and ROLANDO VALLE REYES complaining of Defendants, DANIEL DEFENSE, LLC A/K/A DANIEL DEFENSE, INC., DANIEL DEFENSE HOLDINGS, LLC, M.C. DANIEL GROUP, INC., FIREQUEST INTERNATIONAL, INC., FLASH CO., INC., EOTECH, LLC, PROJECT ECHO HOLDINGS, LLC D/B/A AMERICAN HOLOPTICS, and OASIS OUTBACK, LLC, and allege as follows:

## INTRODUCTION

1.      On May 24, 2022, Robb Elementary in Uvalde, Texas had one of the worst school massacres in U.S. history. 19 children and two teachers were killed, and countless others injured and traumatized while school officials and hundreds of law enforcement officers stood by. An 18-year-old Uvalde young man (the "shooter") with a history of instability and domestic issues legally bought AR-15 semi-automatic rifles, ammunition, high-capacity magazines, and a Hellfire trigger system to use in the school massacre. Because of the marketing, sale, and business practices of the Defendants and their deliberate choices to market and sell lethal weapons directly to young untrained civilians, the shooter bought and assembled a military grade assault weapon with 30-round magazines days after his 18th birthday.

2.      The morning of May 24, 2022, the shooter entered the Robb Elementary School alone, unabated, with weapons, ammunition, wearing tactical gear, and with no experience or training shooting guns. Because of the power, effectiveness, speed, and precision of the Daniel Defense AR-15, the shooter was able to shoot and kill many children and teachers in little time and with no training or interference from 375 law enforcement officials at the scene.  That morning, the shooter shot his grandmother, Celia Martinez Gonzalez, in the face, stole her vehicle, drove the short distance to the school, entered the school hallway and opened fire on Classrooms 111 and 112 leaving 19 children and 2 teachers dead. The shooter was left with free range to shoot, terrorize, and kill children and teachers

Copy from re:SearchTX

for over an hour with no weapons training and no real-life experience other than working at a fast-food restaurant and playing video games.

## I.    DISCOVERY LEVEL

3.      Discovery is intended to be conducted under Level 3 of Rule 190.2 of the Texas Rules of Civil Procedure.

## II.    JURISDICTION AND VENUE

4.      Jurisdiction and venue is proper in Uvalde County, Texas under Texas Civil Practice & Remedies Code §15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claim occurred in Uvalde County, Texas.

## III.    THE PARTIES

5.      **CELIA MARTINEZ GONZALEZ** is a resident of the State of Texas, and during the time of the events giving rise to lawsuit, lived in Uvalde, Texas. Ms. Gonzalez was shot in the face by the shooter on May 24, 2022 before the shooter stole her truck and drove to the school.

6.      **ROLANDO VALLE REYES** is a resident of the State of Texas, and during the time of the events giving rise to lawsuit, lived in Uvalde, Texas. Mr. Reyes is the spouse of Celia Martinez Gonzalez who asserts a loss of consortium claim, and nuisance claim against the Defendants.

### A.    THE DEFENDANTS

7.      **DANIEL DEFENSE, LLC A/KA DANIEL DEFENSE, INC. ("Daniel Defense")** is a limited liability company with its principal office in Black Creek, Georgia.  At all relevant times, Daniel Defense was engaged in the business of researching, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising guns, including AR-15 style semi-automatic rifles, for use by untrained civilians and young adults.  Daniel Defense may be served with process by serving its registered agent, Marvin C. Daniel, at 101 Warfighter Way, Black Creek, Georgia 31308.

Copy from re:SearchTX

8.      **DANIEL DEFENSE HOLDINGS, LLC** is the sole member of Defendant Daniel

Defense, LLC. Daniel Defense Holdings, LLC is a foreign limited liability company duly organized

pursuant to the laws of the State of Delaware that does business throughout the United States, including

conducting business in Texas. Daniel Defense Holdings, LLC does not appear to actively have a Texas

Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary

of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas send this pleading

to: Daniel Defense Holdings, LLC, c/o its Registered Agent in its state of organization, Advanced

Corporate Agent Services, Inc. at 614 North Dupont Highway, Suite 210, Dover, Delaware 19901.

9.      **M.C. DANIEL GROUP, INC.** is the majority member of Defendant Daniel Defense

Holdings, LLC. It is a foreign corporation duly organized pursuant to the laws of the State of Georgia

that does business throughout the United States, including conducting business in Texas. M.C. Daniel

Group, Inc. does not appear to actively have a Texas Registered Agent for service in Texas and thus may

be served through the office of the Texas Secretary of State in accordance with Texas Business

Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of

State should send this pleading to: M.C. Daniel Group, Inc., 107 Wild Turkey Lane, Pooler, Georgia

31322 and to its Registered Agent in its state of incorporation, Marvin Daniel at 101 Warfighter Way,

Black Creek, GA 31308. **Service is requested at this time.** Collectively, Defendants Daniel Defense,

LLC; Daniel Defense Holdings, LLC; and M.C. Daniel Group, Inc. are referred to in this Petition as

"**Daniel Defense**."

10.     **FIREQUEST INTERNATIONAL, INC.** is a foreign corporation duly organized

pursuant to the laws of the State of Arkansas that does business throughout the United States, including

conducting business in Texas. Firequest International, Inc. does not appear to actively have a Texas

Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: Firequest International, Inc., 505 East 5th Street, El Dorado, Arkansas 71730 and to its Registered Agent in its state of incorporation, Lisa McCuistion at 505 East 5th Street, El Dorado, Arkansas 71730. **Service is requested at this time**. Firequest International, Inc. manufactures firearms accessories, such as the Hell-Fire Gen 2 snap-on trigger system purchased by the Shooter, which allows semi-automatic rifles to fire more rapidly, similar to automatic weapons. Upon information and belief, Firequest International, Inc. has an ownership stake in, and exercises control over, the domains firequest.com, hellfire.systems, rockinlock.com, and rapidfiretriggers.net.

11.     **FLASH CO., INC.** is a foreign corporation duly organized pursuant to the laws of the State of Colorado that does business throughout the United States, including conducting business in Texas. Flash Co., Inc. does not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Fouth 3rd Street, Suite 206, Montrose, Colorado 81401 and to its Registered Agent in its state of incorporation, Vincent Troncoso, at 236 South 3rd Street, Suite 206, Montrose, Colorado 81401. **Service is requested at this time**. Upon information and belief, Defendant Flash Co., Inc. has an ownership stake in, and exercises control over, the domains hellfire.systems, rockinlock.com, rapidfiretriggers.net, and firequest.com.

12.     At all relevant times, the websites for hellfire.systems and rapidfiretriggers.net listed Defendant Flash Co. Inc. as the contact point for visitors interested in purchasing Hell-Fire trigger systems.   At all relevant times, rockinlock.com listed the phone number for Defendant Flash Co., Inc. as the contact point for visitors interested in purchasing a Hell-Fire Gen 2 snap-on trigger system.   On the

Copy from re:SearchTX

website hellfire.systems, Defendant Flash Co., Inc. claims to control "Hellfire.systems/ rockinlock.com/ rapidfiretriggers.net/ firequest.com". The website hellfire.systems directs customers to firequest.com for "special wholesale pricing." Collectively, defendants Firequest International, Inc. and Flash Co., Inc. are referred to in this Petition as "**Firequest**."

13.     **EOTECH, LLC** is a foreign limited liability company duly organized pursuant to the laws of the State of Michigan that does business throughout the United States, including conducting business in Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: EOTech, LLC, 46900 Port Street, Plymouth, Michigan 48170 and to its Registered Agent in its state of organization, Joseph Caradonna at 905 West Maple Road, Clawson, Michigan 48017.

14.     **PROJECT ECHO HOLDINGS, LLC D/B/A AMERICAN HOLOPTICS** is a foreign limited liability company duly organized pursuant to the laws of the State of Michigan that does business throughout the United States, including conducting business in Texas. Project Echo Holdings, LLC is the parent company of EOTech, LLC. Project Echo Holdings, LLC does not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: Project Echo Holdings, LLC d/b/a American Holoptics, 905 West Maple Road, Clawson, Michigan 48017 and to its Registered Agent in its state of organization, Joseph Caradonna, 905 West Maple Road, Clawson, Michigan 48017. Defendant **Koucar Management, LLC** is a foreign limited liability company duly organized pursuant to the laws of the State of Michigan. Koucar Management, LLC operates under the following assumed names: Koucar Industries; Koucar International; and Koucar Worldwide. Koucar

Copy from re:SearchTX

Management, LLC is the parent company of Project Echo Holdings, Management, LLC does not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: Koucar Management, LLC d/b/a Koucar Industries, Koucar International and Koucar Worldwide, 905 West Maple Road, Clawson, Michigan 48017 and to its Registered Agent in its state of organization, Joseph Caradonna, 905 West Maple Road, Clawson, Michigan 48017.

15.     Collectively, Defendants EOTech, LLC; Project Echo Holdings, LLC; and Koucar Management, LLC are referred to in this Petition as **EOTech.** EOTech manufactured, marketed, sold, and shipped a holographic battle sight to the Shooter in Texas.

16.     **OASIS OUTBACK, LLC ("Oasis")** is a Texas limited liability company with its principal office in Uvalde, Texas.  Oasis Outback is a firearms dealer in the business of selling guns, including AR-15 style semi-automatic rifles, to untrained civilians and young adults in Uvalde, Texas. Oasis Outback served as the local gun dealer for Daniel Defense to complete the sale of guns and ammunition to the Uvalde school shooter. Oasis Outback may be served with process by serving its registered agent and chief executive officer, William R. Klein, at 236 East Nopal Street, Uvalde, Texas 78801.

## IV.  GENERAL ALLEGATIONS

### A.  Gun Violence In America

17.     The United States leads the world in the number of children injured and killed every year by guns.  Tragically, as the number of American gun sales rise, so do deaths. According to the Centers for Disease Control and Prevention, the rate of gun deaths of children 14 and younger rose by roughly 50 percent from the end of 2019 to the end of 2020.  In 2021, over 1,500 children and teenagers younger than 18 were killed in homicides and accidental shootings, compared with about 1,380 in 2020.

Copy from re:SearchTX

18.     Mass shootings are also on the rise in the U.S. almost doubling in the past four years. [1] In 2018, there were 336 mass shootings, 417 in 2019, 610 in 2020, and 691 in 2021.[2] After the Uvalde school shooting, the FBI released a report "Active Shooter Incidents in the United States, 2021," showing a rapid increase in public shootings in the U.S  Texas, Georgia, and California had the most active shooter events.[3]

19.     Of the ten most destructive mass shootings in the U.S. between January 2012 and the present, 70% were committed by male shooters between the ages of 18 and 26.[4]  People of all genders aged 18 to 26 comprise only 12 percent of the U.S. population but are responsible for committing *70 percent of the mass shootings*.[5] (emphasis added).  Mass shootings are most often committed by young males. 60 of the 61 active shooters in 2021 were, like the Uvalde school shooter, males who acted alone.[6]

20.     Mass shooters prefer to use "AR-15 style" assault rifles in their massacres because they accomplish the most kills in the least amount of time. AR-15 rifles are user friendly, precise, and accurate every time.  The mass shooter does not need any previous weapons training or experience at all to use the rifle and make the kills.

21.     AR-15 style rifles were designed for the U.S. military, not for civilians.  "AR" refers to

---

[1] "Mass shooting" is defined as 4 or more victims shot, either injured or killed, not including the shooter.  *See* Gun Violence Achieve, https://www.gunviolencearchive.org/methodology.
[2] *See* Gun Violence Archive, https://www.gunviolencearchive.org/past-tolls.
[3] Federal Bureau of Investigation, *Active Shooter Incidents in the United States in 2021*, (May 24, 2022).
[4] Everytown for Gun Safety, *Complaint and Request for Investigation of Daniel Defense, LLC*, Federal Trade Commission, Samuel Levine, Director, Bureau of Consumer Protection, (July 15, 2022)
[5] *Id.* Everytown calculated the relevant population percentage based on the 2019 data in the data set titled Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States: April 1, 2010, to July 1, 2019, and provided by the U.S. Census Bureau. https://www.census.gov/data/tables/time-series/demo/popest/2010s-national- detail.html
[6] Federal Bureau of Investigation, *Active Shooter Incidents in the United States in 2021*, (May 24, 2022) at 17.

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

ArmaLite, Inc., a small American gun manufacturer that designed and made the AR style rifle for the military between 1957-1959.  Gun manufacturer, Colt, bought the AR design from ArmaLite in the 1960s and started manufacturing a version known as the M-16 for the U.S. troops in the Vietnam War. When Colt's patents for the AR-15 ended in the 1970s, other manufacturers began making similar models.  AR-15 is the generic term for the design created by ArmaLite.

22.     The AR-15 was specifically designed with the combat soldier in mind and not designed for civilian use.  The AR-15 is lightweight, has a higher velocity than preceding military rifles, and can hold more ammunition at one time.  AR-15s are *automatic* loading weapons that fire one shot per each trigger pull then automatically reload the chamber with the next round.  Without changes, an AR-15 style rifle can fire about 60 rounds a minute, which is up to *three times* faster than regular weapons. Because of the speed, rapid fire, and velocity of this weapon, ammunition can hit the victim, quickly tear through limbs and organs, and explode leaving the victim little chance of survival. What makes these weapons even more deadly is the high-capacity ammunition magazine capability.  30-round magazines are standard, but ammunition magazines or drums holding up to 100 rounds can be added in seconds.

23.     The AR-15 design also allows a shooter to spray lots of bullets over a large area in little time.  The shooter does not need to waste time targeting subjects nor does the shooter need to be an expert marksman to get the kills. The AR-15 is so light it can be used with one hand.  For even more speed, a trigger system can be added for under $50.00 to convert the AR-15 inro a fully automatic machine gun.

24.     Because of these features, AR-15s are the weapons of choice for civilian mass shooter like the Uvalde school shooter. AR-15s are user friendly, light, precise, and most likely to kill regardless of the shooter's steadiness or weapons' experience.  An untrained civilian like the Uvalde school shooter can "hose down" many targets in little time and with little error.  The AR-15 is so effective that someone

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

like the Uvalde school shooter, *who had never shot a gun before the massacre,* can murder 19 people, and injure countless others within feet of law enforcement trained in active shooter techniques and protocols.

25.     In 1968, Congress amended the National Firearms Act of 1934 ("NFA") and expanded the definition of machine gun to include "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The definition includes "the frame or receiver of any such weapon," as well as "any part" or "combination of parts.

26.     Interpreting this language, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") clarified in 1982 that semiautomatic firearms (both rifles and pistols) that possess design features that allow them to easily be converted to automatic weapons with "simple modification or elimination of existing component parts" were "machineguns" under the NFA.[7]  That is, even if a gun was not originally a machinegun, it qualifies as one under the NFA if it can be simply modified into one.

27.     The Uvalde school shooter carried 60 30-round magazines and legally bought a Hell-Fire Gen 2 snap-on trigger system allowing his Daniel Defense AR-15 style rifle to fire like a fully automatic machine gun without manual reloading.[8]  There were no barriers to him putting together this machine gun and neither the gun maker, Daniel Defense, nor gun seller, Oasis Outback, reported the gun to the ATF as meeting the definition of a machine gun.

28.     Between 2009 and 2022, the six deadliest mass shootings in the U.S. all involved the use of assault weapons and/or high-capacity magazines: Las Vegas (58), Orlando (49), Newtown (27), Sutherland Springs (26), El Paso (23), and Uvalde (21). Assault weapons with high-capacity magazines

---

[7] ATF Ruling 82-2; ATF Ruling 82-8.
[8] *Id.* at 35. The Hellfire trigger system was found on the floor of the classroom.

Copy from re:SearchTX

are disproportionately used in public mass shootings. Of the shootings with known weapon type, 76 percent of those that involved an assault weapon and/or high-capacity magazine occurred in public compared to 44 percent of those that involved a handgun.[9]

29.     AR-15 style rifles were banned in the U.S. from 1994-2004.  The Public Safety and Recreational Firearms Use Protection Act or Federal Assault Weapons Ban ("AWB"), a subsection of the Violent Crime Control and Law Enforcement Act of 1994, was a U.S. federal law that prohibited the making of certain semi-automatic weapons, defined as "assault weapons," and certain large capacity ammunition magazines for civilian use.  The 10-year ban was passed by Congress on August 25, 1994, and signed into law by President Bill Clinton on September 13, 1994.[10] The AWB ban applied only to weapons made after the ban's enactment. It ended on September 13, 2004, under its sunset provision. Constitutional challenges were filed against provisions of the ban, but all were rejected by the courts.

30.     The AWB prohibited the making of 19 specific assault weapons and any semi-automatic rifle, pistol, or shotgun capable of accepting a detachable magazine with two or more features considered characteristic of such weapons, such as telescoping or folding stocks, pistol grips, flash suppressors, grenade launchers, and bayonet lugs. The AWB also prohibited possession of newly manufactured magazines holding over ten rounds of ammunition.  On the day of the Uvalde school shooting, there was no federal ban on semi-automatic weapons or high-capacity magazines.

31.     The AWB ban has been criticized as ineffective and rife with exceptions and loopholes. But studies show mass shootings went down during the ban, then rose after the ban expired in 2004.  In a study led by Charles DiMaggio, Ph.D., an injury epidemiologist at New York University, assault rifles

---

[9] Everytown Research & Policy, Mass Shooting in America (August 15, 2022), https://everytownresearch.org/maps/mass-shootings-in-america/
[10] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (codified as amended in scattered sections of 18 U.S.C. and 42 U.S.C.).

Copy from re:SearchTX

accounted for 430 or 85.8% of the total 501 mass-shooting fatalities reported (95% confidence interval, 82.8-88.9) in 44 mass-shooting incidents.[11]  Mass-shooting fatalities were 70 percent less likely to occur during the federal ban period.[12]

### B.   Most School Shooters Are Young Adult Males

32.     A disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24, with 18 to 20-year-olds being nearly four times more likely to perpetrate a gun homicide than those 21-years-old or older.[48.]  School shooters are commonly young adult males, age 18-21.[13]  This is because the area of a young adult brain known as the "frontal lobe," which is responsible for higher level executive functioning including decision making and emotional regulation, is not yet mature.  The brain of a young adult, age 18 to mid-twenties, has less capacity for rational, reasoned, and thoughtful judgment than a mature brain. Young adults lack impulse, emotional, and self-control and are more likely to engage in risky behaviors, random violence, and hasty, mindless decision-making. Due to the ongoing changes in the brain along with the physical, emotional, and social changes of adolescence, young adults are more vulnerable to stress, emotional outbursts, emotional instability, and mental health problems.  The brain does not reach full development until a person is in their mid to late 20s.[14]  It is reckless to expect that the still developing brain of a young adult has the capacity and maturity to responsibly handle lethal weapons, AR-15s, high-capacity magazines, and systems readily available to convert a rifle to a machine gun outside a military or other structured setting

---

[11]  Charles Dimaggio, et al., *Changes in US mass shooting deaths associated with the 1994-2004 federal assault weapons ban: Analysis of open-source data*, 86 J. of Trauma and Acute Care Surg. 11-19 (2019).

[12] *Id.*

[13]  Joshua Brown, et al., *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States*, 1982-2018, 108 Am. J. of Public Health 1385-1387 (2018).

[14]  The National Institute of Health, *The Teen Brain, 7 Things to Know*, NIH Publication No. 20-MH-8078 (Revised 2020), https://www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know.

Copy from re:SearchTX

where the person is educated, trained, and supervised.  Insurance companies know this and generally don't reduce their rates for young drivers until they reach age 25.[15]

33.     Despite the biological and developmental features of the brain which are widely known, gun makers and sellers aggressively market deadly weapons directly to adolescents and young adults using deception and even going as far as using youth culture icons such as Star Wars, Fortnite, and Call of Duty in their advertising.  Gun makers and sellers deliberately glamorize and push their lethal weapons into the hands of unpredictable, emotional, and volatile young adult civilians knowing that doing so is a grave public safety concern.  The gun makers and sellers marketing and selling practices are needlessly reckless, absurd, and dangerous to the public including American children. Gun makers and sellers understand their consumer audience, research their targets' preferences, activities, and features, and are keenly aware of the vulnerabilities and emotional variability of the young adult minds they target.

**C.   Onset Of Mental Illness In Young Adults**

34.     Adolescence and young adulthood are also when symptoms of psychiatric illness first appear and begin to manifest. It may take years before a diagnosis is confirmed as symptoms may be dismissed as part of adolescence and teen mood instability.  Symptoms of isolation, anger, agitation, sadness, volatility, paranoia, and changes in appearance and dress may be brushed off as "finding one's way" rather than considered the onset of mental illness requiring treatment.  A serious mental pathology can be missed right when the young person is of age to buy a semi-automatic deadly weapon.  A background check will not work if there is no history to report.

35.     In many instances, mental illness is not known before age 25, while the average age of

---

[15] Metz, Jason, *How Age and Gender Affect Car Insurance Rates* (Nov. 7, 2021), https://www.forbes.com/advisor/car-insurance/rates-age-and-gender (last accessed November 10, 2022).

Copy from re:SearchTX

school shooters is 18-21.[16]  In the first large scale study on the onset of psychiatric illness, researchers found the global onset of the first mental disorder occurs before age 14 (in one-third of individuals), age 18 in almost half (48.4%), and before age 25 over half (62.5%).[17]   In other words, the onset of mental illness coincides with the data pointing to the average age of mass shooters.  The 18-year-old Uvalde school shooter displayed symptoms of mental disturbance, violence, and had a history of domestic issues, but had no barriers to buy a lethal assault weapon from the Gun Defendants. The Gun Defendants are aware of the features and vulnerabilities of their young consumers, yet they consciously choose to market directly to this population at this critical time of developmental and maturation.  There is no utility other than profit to do so.  A background check at age 18 will likely not capture a gun purchaser's any mental health that would prohibit the sale.

36.     Gun makers have made more than $1 billion from the sale of AR-15 style rifles in the last decade.  Daniel Defense's revenue from AR-15 style rifles tripled from $40 million in 2019 to over $120 million in 2021.[18]  Its CEO publicly acknowledged the huge profits flowing from mass shooting events. As mass shootings double, so do the gun industry's profits and demand for AR-15 rifles.  None of the gun makers' profits are assigned to any of the victims or to any efforts to stop the marketing or sale to adolescents and young adult civilians.

## V.   STATEMENT OF FACTS

### A.  Uvalde, Texas

37.     Uvalde, Texas is a small rural community located 80 miles from the Mexican border.

---

[16] *Id.*

[17] Solmi M, Radua J, Olivola M, Croce E, Soardo L, Salazar de Pablo G, Il Shin J, Kirkbride JB, Jones P, Kim JH, Kim JY, Carvalho AF, Seeman MV, Correll CU, Fusar-Poli P. *Age at Onset of Mental Disorders Worldwide: Large-Scale Meta-Analysis of 192 Epidemiological Studies,* Mol Psychiatry. 2022 Jan;27(1):281-295. doi: 10.1038/s41380-021-01161-7. Epub 2021 Jun 2. PMID: 34079068; PMCID: PMC8960395.

[18] *The Committee's Investigation into Gun Industry Practices and Profits* Memorandum from Carolyn B. Maloney, Chair, Committee on Oversight and Reform, at 2 (July 27, 2022).

Copy from re:SearchTX

Uvalde has about 25,000 residents, a majority of whom are Latino.[19]  It is a tight knit, friendly

community where people still believe in a sense of community and helping others.

38.     The Uvalde School District covers nine campuses, including Robb Elementary, which

educates students grades second through fourth. Mandy Gutierrez was appointed the principal of Robb

beginning with the 2021-2022 school year.  She has since been re-assigned. In 2018, the School District

established its own police department, the UCISD PD, headquartered at Uvalde High School. With nine

schools and a budget for only six police officers, the School District oversees more schools than it has

officers.  No officer was specifically assigned to Robb Elementary.[20] Instead, officers would regularly

visit the Robb campus for a walk-through several times per week, usually lasting from 15–45 minutes.[21]

There were no School District law enforcement officers at Robb the morning of May 24, 2022.

**B.   Celia Martinez Gonzalez, Victim of Gun Violence**

39.     Celia Martinez Gonzalez is 69 years old, a life-long resident of Uvalde, and now a victim

of gun violence.  Ms. Gonzalez served in the Uvalde School District for over 25 years as a teacher's aide

and substitute teacher until she retired.  Ms. Gonzalez and Rolando Reyes have two daughters, one who

serves in the Navy and the other who has a troubled history of drug abuse and who is the mother of the

---

[19]  United States Census Bureau, https://www.census.gov/quickfacts/uvaldecountytexas.
[20]  H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 13 (Tex. 2022).
[21]  Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022) (couple times per week, approximately 15 minutes per visit); *see also* Committee testimony of Adrian Gonzalez, Uvalde CISD police officer (June 20, 2022) (usually took 30-45 minutes to walk Robb Elementary); Committee testimony of Jaime Perez, Robb

Elementary head custodian (June 16, 2022) (about once per day, usually for less than an hour unless dealing with a problem); Committee testimony of Kenneth Mueller (June 16, 2022) (officers would float, visiting all elementary-school campuses). Uvalde CISD police officer Ruby Gonzalez described how she and her colleagues would rotate shifts based at the high school. The 7:00 a.m.–4:00 p.m. shift would begin with traffic control and watching the courtyard at the high school, followed by rounds to check in at other campuses, walk halls, and check doors. Similarly, the officer working the 9:00 a.m.–6:00 p.m. shift would visit various campuses in the afternoon. Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

Copy from re:SearchTX

shooter.  She and her spouse, Rolando Reyes live in Uvalde.  In about February 2022, the shooter and

his mother got into an argument and law enforcement was called.  The shooter's mother said she was

moving away leaving him behind without a place to live.  Law enforcement responding to the incident

asked the shooter whether he had any family he could stay with and when he responded that he had

grandparents in Uvalde, the officer gave him a ride to Ms. Gonzalez's home.  Ms. Gonzalez and Mr.

Reyes agreed to allow "Salvador" to stay temporarily while he saved money to move to San Antonio,

Texas. He was working at Wendy's in Uvalde.

40.     Ms. Gonzalez did not raise the shooter, nor had he ever stayed with her before February

2022. Ms. Gonzalez and her husband did not own guns, use guns, nor did they allow weapons in their

home.  Ms. Gonzalez and her husband did not know the shooter was buying weapons, ammunition, or

tactical gear.

41.     The morning of May 24, 2022, Ms. Gonzalez was tidying things in the hallway in a bent

over posture and when she stood up, the shooter was facing her with a gun.  He shot her directly in the

face and left her for dead.  Ms. Gonzalez fell to the floor bleeding.  The shooter, believing she was dead,

posted on Facebook that he just shot his grandmother.  He stole Ms. Gonzalez's truck and left.  He did

not know how to drive, did not have a license, and crashed the truck near the Robb Elementary School

where he started his rampage.

42.     Ms. Gonzalez managed to crawl outside, down the driveway, and across the street to her

neighbors who called 911.  After an interaction with Sheriff Ruben Nolasco, Celia was taken by

helicopter transfer a hospital in San Antonio, Texas. The bullet went through her cheek and destroyed

her jaw requiring multiple reconstructive surgeries, and painful treatments, which are ongoing

43.     Prior to May 24, 2022, Ms. Gonzalez had not had any issues in the short time the shooter

was staying in her home. Like all victims, she has been devastated and destroyed not only by her own

Copy from re:SearchTX

pain and physical injuries, but by the mental anguish and loss of life in her beloved community and in the Robb Elementary, the school she also attended.

**C.  The Shooter**

44.     The Uvalde school shooter was 18 years old on the day of the massacre and was well-known to be a student with a history of mental health concerns, school truancy, and isolation.  Instead of turning his anger inward and hurting himself, he turned it outward, hurt others, going back to the very classroom where he was bullied and killing innocent people. He dropped was consistently absent from school eventually dropping out but no one ever from the School District ever investigated.

45.     It was well known to the School District the shooter was having problems at school and problems interacting with other students. There is a history he was a victim sexual assault.  Early on the shooter had problems with stuttering and speech, learning, low test scores and noted to be at risk.  Other kids made fun of him because he was poor and dressed funny.  The shooter was bullied and harassed because of his disabilities.  In fact, his mother complained but nothing was ever done.  For these reasons alone, the shooter should have been referred for Special Education Services pursuant to the *Individuals With Disabilities Education Act* ("IDEA"), 20 U.S.C. 1401 *et seq*. But was not. Bullying of the shooter had become a concern by the fourth grade, and in notes found on his phone, he described them as worsening in middle school.  Records show his declining attendance, with more than one hundred absences annually beginning in 2018, along with failing grades and increasingly dismal performance on standardized and end-of-course exams. The Committee heard testimony that he was reluctant to interact with peers because of a speech impediment. Poverty is not an unfamiliar circumstance in Uvalde—86% of the children in the school district may be economically disadvantaged.  The shooter often wore the same clothing day after day.

46.     Early school assessments showed he was behind other students academically, and by third grade, school officials already had identified him as "at-risk" due to consistently poor test results. School

Copy from re:SearchTX

records reveal that someone may have asked for speech therapy for the attacker, and his later internet searches show he himself sought information on dyslexia. Ultimately, he received no special education services. The shooter's fourth grade year at Robb Elementary School was significant to him.

47.     The shooting took place in the shooter's former fourth grade classroom, and he discussed bad memories of fourth grade with an acquaintance just weeks before. In testimony before the Committee, two different narratives have emerged. The shooter's fourth grade teacher testified before the Committee. Not only did she know the shooter from having been his teacher, but she was also in Robb Elementary's fourth grade building, in a different classroom, at the time of the shooting. This teacher told the Committee she knew the shooter needed extra help in her class because he claimed to be a victim of bullying. She testified that she met with the shooter's mother, over her concerns about bullying, and that she had promised mother that her son would have a good fourth grade year. According to the teacher, it was a good year for the shooter. She said she believed her classroom was a safe place for him and that he made friends there.

48.     Members of the shooter's family, however, reported to the Committee their belief that other students still bullied the shooter throughout his fourth-grade school year over his stutter, clothing, and short haircut. A cousin of the shooter said she was in the same fourth grade class with him, and she corroborated this version of his experience that year. She reported an incident in which another girl in the class tied the shooter's shoelaces together, resulting in him falling over and injuring his face. The family also reported their belief that some teachers also picked on the shooter and his cousin.

49.     By middle school and high school, the shooter had significant problems with attendance and truancy. Pursuant to state law and rules issued thereunder, he should have been referred for Special Education Services but was not.   There is no record that a School Resource Officer or any staff member ever visited the home of the shooter to address his truancy.

Copy from re:SearchTX

50.     Despite his absences, or maybe because of them, the attacker had almost no disciplinary history at school. The single infraction on his school record is for "mutual combat" with another student in a hallway in late 2018, resulting in a three-day suspension. By 2021, at age seventeen, the shooter had only completed the ninth grade.

51.     In mid-2021, the shooter's relationship with the girlfriend later interviewed by the FBI ended. She described the shooter as lonely and depressed, constantly teased by friends who called him a "school shooter."  She said he told her repeatedly that he wouldn't live past eighteen, either because he would commit suicide or simply because he "wouldn't live long." The shooter responded to the breakup by harassing the girl and her friends.

52.     The shooter had domestic problems also and would act out cutting up his face with knives.[22] Uvalde PD was called multiple times due to conflicts between the shooter and his mother.[23] He would drive around with another friend at night to shoot at random people with a BB gun or egg their cars.[24] He wore all black, had long black hair and wore large military boots.[25] The shooter once commented to a friend he wanted to join the Marines to kill people.[26]

53.     The shooter used Yubo and Instagram to send sexually aggressive comments, and threats of kidnap, rape, and death.[27] Multiple teens reported the violent threats made by the account alleged to

---

[22] Robert Klemko et al., *Gunman bought two rifles, hundreds of rounds in days before massacre*, The Washington Post (May 25, 2022), https://www.washingtonpost.com/nation/2022/025/uvalde-texas-school-shooting-gunman/.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] Alyson Klein, *The Uvalde Shooter Posted Threats on Yubo. What to Know About the App and Others Like It*, Education Week, (June 2, 2022), https://www.edweek.org/leadership/the-uvalde-shooter-posted-threats-on-yubo-what-to-know-about-the-app-and-others-like-it/2022/06.

Copy from re:SearchTX

be the shooter, but nothing ever came of it.[28]  In one chatroom, the shooter bragged about buying his guns and then said that "girls deserved to get raped."

54.     On October 28, 2021, Uvalde High School involuntarily withdrew the shooter, citing poor academic performance and lack of attendance. Even though Texas law and the regulations and rules issued thereunder required the School District to actively address this problem and refer the student to Special Education services, they did not. The shooter was left behind and in response continued down a very dark path.

55.      In late 2021, the shooter ordered rifle slings, a red dot sight, and shin guards, as well as the body armor carrier worn on the day of the Robb massacre.[29]  He asked friends and family members to buy guns for him since he was underage.[30]  No one would buy him the guns.

56.     The shooter networked with local peers in ongoing group chats on Snapchat, and played a range of videogames, including the Call of Duty and Grand Theft Auto series, which glamorize guns and murder. Most of his usernames and even his email address reflected themes of confrontation and revenge.  The shooter showed interest in gore and violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like, as well as sending unexpected explicit messages to others online.[31]  None of his online behavior was ever reported to law enforcement, and if it was reported by other users to any social media platform, it does not seem that actions were taken to restrict his access or to report him to authorities as a threat.

57.     Beginning in February 2022 the Uvalde PD was called to the shooter's home to address a

---

[28] Silvia Foster Frau, Cat Zakrzewski, Drew Harwell, & Naomi Nix, *Before Massacre, Uvalde Gunman Frequently Threatened Teen Girls Online*, The Washington Post, (May 28, 2022).
[29] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 33 (Tex. 2022).
[30] *Id.* at 34.
[31] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 32 (Tex. 2022).

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

domestic disturbance with his mother.  No arrests were made.  Following that, the shooter moved out and went to live with his grandparents temporarily while preparing to move to San Antonio.  He continued to work and told his grandparents he was saving to move out of Uvalde. His grandmother Ceclia Gonzalez knew the shooter to be quiet and docile but had experienced problems with his mother at home.  She allowed him to move in temporarily to save money to move to San Antonio.

58.     Also in February 2022, and while still underage, the shooter bought firearms accessories including 60 30-round magazines, a holographic weapon sight, and a Hell-fire Gen 2 snap on trigger system.[32]  A Hellfire trigger system, nearly identical to a bump stock, lets a rifle fire at a rate like a fully automatic weapon.  The bump stock device was banned after the 2017 Las Vegas mass shooting, but the Hellfire trigger systems is still legal.  The Hell-fire trigger system clamps to the trigger guard behind the trigger and presses a "finger" against the back of the trigger to increase the force that returns the trigger to its forward position, effectively decreasing the time required for the trigger to reset, allowing for a faster follow up shot. The Hell-Fire converts an otherwise semiautomatic firearm into a machine so the shooter can continue firing (even with one hand) without additional physical manipulation of the trigger by the shooter.  In other words, the Hell-Fire gives machine gun power to a civilian *legally.*

59.     On February 28, 2022, there was a discussion on Instagram on February 28, 2022, about Salvador Ramos being a "school shooter."[33] Ten days before the shooting, he messaged an individual, "10 more days," to which the person responded, "are you going to shoot up a school or something?" The shooter responded, "No, stop asking dumb questions. You'll see."

60.     On March 23, 2022, a suspicious person dressed in all black with a backpack was seen

---

[32] *Id.* at 35.

[33] Julie Moreno, *There Were Warnings, Clues About Uvalde School Shooting from Social Media Posts, Investigators Say*, KSAT News, (May 27, 2022). https://www.ksat.com/news/local/2022/05/27/there-were-warnings-clues-about-uvalde-school-shooting-from-social-media-posts-investigators-say/.

Copy from re:SearchTX

canvasing Robb Elementary, but no one ever identified the person.

61.    On May 16, 2022, days after his 18th birthday, the shooter bought 2 AR-15 style, semiautomatic rifles, 60 30-round magazines, and over 2,000 rounds of ammunition. He collected tactical gear and ammunition well before his birthday but could not buy the firearms legally. According to friends and family, he had no firearm experience and had never shot a gun until the massacre.

62.    On May 17, 2022, the shooter bought a Smith & Wesson M&P15, AR-15 style, semi-automatic rifle, from Oasis Outback in Uvalde, Texas.  Oasis Outback is a local sporting goods store that also serves as a local firearms dealer to complete online purchases made directly from gun manufacturers.

63.    On May 17, 2022, the shooter bought 1,740 rounds of 5.56mm 75 grain boat tail hollow points for $1,761.50 shipped directly to his house.

64.    On May 18, 2022, the shooter returned to Oasis Outback to buy 375 rounds of 5.56 caliber ammunition.

65.    On May 20, 2022, the shooter returned to Oasis Outback to pick up another weapon, an AR-15 style semi-automatic rifle, DDM4 V7, which he bought directly online from Daniel Defense for $2,054.28.  All weapons were hidden from his grandmother and anyone else at the home.

Copy from re:SearchTX





66.     Oasis Outback knew, or reasonably should have known, the shooter was suspicious and

dangerous.  The shooter went to the store three times in four days signaling his desperation and intent to

quickly buy weapons.  In that short period, the shooter picked up or bought $3,000 worth of guns and

ammunition, including two AR-style rifles. Oasis Outback was required to report the multiple sale of

rifles to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") pursuant to a letter issued

Copy from re:SearchTX

by the ATF on July 12, 2011. Fulfilling its reporting requirements, however, would not have absolved Oasis Outback of its duty to block a sale on other relevant grounds.

67.     Oasis Outback knew, or reasonably should have known, the shooter was likely to harm himself or others. Oasis Outback's owner talked to the shooter and asked how he could afford $3,000 worth of guns and ammunition. The owner noticed the shooter was always alone and quiet, all warning signs of a mass shooter.  Store witnesses who saw the shooter at Oasis Outback buying expensive AR-15 style weapons and large amounts of hollow point ammunition told the FBI the shooter was "very nervous looking" and "appeared odd and looked like one of those school shooters."  Another witness described the shooter's all black clothing as simply giving off "bad vibes." [34]

68.     Oasis Outback sold the shooter the guns and ammunition knowing he was suspicious and likely dangerous to others.  The store owner and his staff did not act on their suspicions and block the purchases or tell law enforcement.  Because of Oasis Outback's acts and omissions, the shooter was able to assemble a lethal military-grade assault weapon with a 30-round capacity magazine capable of pulverizing many people within minutes with no oversight, licensure, experience, or training.

**D.   The Gun Maker – Daniel Defense**

69.     Daniel Defense is a Georgia-based gun maker who proudly markets itself as a military weapons dealer located at 101 Warfighter Way, Black Creek, Georgia.  Daniel Defense researches, develops, designs, manufactures, markets, and sells semi-automatic weapons, including AR-15 style rifles, for use and possession by civilians and young adults.

70.     Daniel Defense makes millions off the sale of assault weapons but does not track death, dangers, or crimes resulting from use of their guns, does nothing to curtail marketing and sales of its guns to vulnerable young consumers, and does nothing to inform and educate consumers and the public

---

[34]  H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 36 (Tex. 2022).

Copy from re:SearchTX

of the dangers associated with purchase and use by young adult civilians.  Daniel Defense's advertising

is built on deception misleading consumers to believe Daniel Defense is a military weapons supplier to

gain market share and increase sales.  Daniel Defense made $528 million from AR-15 style rifle sales

from 2012 to 2021.[35]

> **1.   *Daniel Defense Aggressively Markets to Untrained Civilians and Young Adults Using Deceptive and Unfair Advertising.***

71.    Although 90 percent of its sales are to civilians, Daniel Defense aggressively markets

itself as a military weapons dealer leading consumers to believe they are buying military sponsored

weapons.  Daniel Defense promotes its AR-15 style rifles as the same used by the U.S. military

deceiving consumers, including young adults and untrained civilians.  Daniel Defense's advertising

---

[35] *The Committee's Investigation into Gun Industry Practices and Profits* Memorandum from Carolyn B. Maloney, Chair, Committee on Oversight and Reform, at 6 (July 27, 2022).

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

blasted over the internet and on social media sites has images of combat scenes and soldiers carrying its guns into battle.



72.     Daniel Defense's marketing tells consumers to "Use What They Use" yet Daniel Defense has **no weapons' contracts** with the U.S. military.

73.     Daniel Defense's marketing is deceptive, unscrupulous, and deliberately plays on the vulnerabilities of its audience making it unlawful and unfair. Daniel Defense's AR-15 rifles share similar features to the military assault rifle, M-16, and both designs feature exceptional muzzle velocity, the ability to accommodate large-capacity magazines, and effective rapid fire.  The significant difference is the M-16 was not developed for civilian mass shootings and certainly not intended to be used by untrained young adult civilians.  Daniel Defense's guns are accessible to civilian consumers unlicensed, untrained, and as young as 18 years old, and Daniel Defense targets this consumer directly.

28
PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX



74.     Daniel Defense's advertising statements and images are blatantly false, misleading, and unfair.  Daniel Defense's advertising depicts military men in combat gear on active battlefields telling the purchaser that is the power, force, and prestige buying the weapons will bestow.  The purchaser's fantasy, which may be only in online games, can come to life with Daniel Defense's guns, which Daniel Defense promises have been "tested, proven, and chosen" by the U.S. military.  This is false.  Daniel Defense intentionally misleads consumers in a fantasy scheme engineered for maximum profit at the expense of public safety and American lives using the military, among other imagery, as its bait.  Daniel

Copy from re:SearchTX

Defense has no weapons contracts with the U.S. government contrary to what it deliberately depicts. [36]



75.     Daniel Defense intentionally uses the military images and vernacular in its advertising to create a "halo effect" to increase sales.  The "halo effect" is a well-studied psychological phenomenon that causes a person to make choices in favor of something the person associates with positive experiences, bias, or prejudices, regardless of accuracy. The "halo effect" of Daniel Defense's military advertising causes suspectable consumers to buy their weapons believing that if the weapons are good enough for the military, they must be the best.

76.     Daniel Defense is known in the industry for its brazen and provocative marketing. Daniel Defense specifically targeted young children not of age to buy guns.  Much of its heavy social media marketing is on Instagram and Twitter, which are popular with youth.  Daniel Defense does not limit or age-restrict access to any of its marketing and freely allows all ages to

---

[36] https://danieldefense.com/faq

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

take in its violence-based content.  It uses fast-moving, high-quality videos drowning in electronic

music, featuring gun-toting young adults and allusions to popular video games like *Call of Duty* and

movies such as *Star Wars.*



77.    Daniel Defense's use of youth popular culture themes and icons is intended to attract and

unfairly exploit the vulnerabilities of children and young adults. Daniel Defense specifically targets

adolescents and young adults knowing this consumer group is unqualified by age or experience to

anticipate or appreciate the possibility the representations may be exaggerated or untrue.  Moreover,

there is no caution or disclaimers to the young audience warning them the weapons are not intended for

them, as physiologically immature consumers.

78.    Daniel Defense promises young adults' power and glamour when using its guns couple

with the force and prestige of military grade lethality.  Daniel Defense even offers financing deals to

purchasers, like young adults, who cannot afford to wait.  A purchaser can buy an assault weapon from

Daniel Defense through a "buy now, pay later" program letting the purchaser have the gun right away.

Daniel Defense will finance murder, which is especially convenient for young adults who cannot afford

the weapons or cannot afford to wait to save up the money.

Copy from re:SearchTX

79.     Daniel Defense promotes its weapons with images of children.  Days before the Uvalde school massacre, Daniel Defense tweeted a picture of a toddler holding an AR-15 style rifle captioned with a biblical quote from the Book of Proverbs: "Train up a child in the way he should go, and when he is old, he will not depart from it.



80.     Daniel Defense admits 90 percent of its purchasers are consumers that are not military trained and not competent to responsibly use the guns.

81.     Daniel Defense admits children should not handle or use their guns:

Store your firearm and ammunition securely locked in separate locations out of the reach and sight of children. (Children are naturally curious and do not always believe or understand the real danger and responsibilities of firearms.)

Copy from re:SearchTX

Daniel Defense admits the consumers they target should not use their guns:



> ⚠ **CLEANING AND STORAGE CAUTIONS**
> 1. **ALWAYS** make sure your firearm is completely UNLOADED before you attempt to clean or store your firearm.
> 2. **ALWAYS** store your firearm and ammunition SEPARATELY and SECURELY out of reach of anyone who should not have access to them.
>    a. Keep it out of reach of children and others who are not trained in the safe handling of firearms.
>    b. Keep firearms and ammunition locked securely when not in use to prevent them entering the wrong hands.

None of these disclaimers are in their marketing materials and in fact their marketing promotes the opposite.

### 2. *Daniel Defense Knows Their Weapons Are Used in Mass Shootings.*

82.     Daniel Defense knows their AR-15 style assault weapons with their rapid-fire large ammunition capacity are the weapons of choice for mass shootings. Four of Daniel Defense's semi-automatic rifles were part of the arsenal of firearms used by in the Las Vegas shooting that killed 60 people in 2017.  Smith & Wesson's assault weapons also purchased by the Uvalde school shooter have been used in some of the worst mass shootings in U.S. history including:

a.   2022 Fourth of July shooting in Highland Park, Illinois where Robert E. Crimo III, age 21, murdered 7 people using a Smith & Wesson M&P15 he bought online.[37]

b.   2018 Stoneman Douglas High School shooting in Parkland, Florida where Nikolas Cruz, age 19, murdered 17 people.  All victims were shot in under four minutes.

c.   2015 San Bernardino, California shooting where terrorists murdered 14 people using

---

[37] *Highland Park Suspect Robert Crimo Bought Rifle Used in Attack Online*, New York Post (July 6, 2022); *Illinois State Police Director Defends Decision to Give Suspected Highland Park Killer a Gun Permit in 2020*, Chicago Sun Times (July 6, 2022).

Copy from re:SearchTX

AR-15 style rifles, including a Smith & Wesson M&P15. [38]

    d.   2012 Aurora, Colorado theater shooting where James Holmes, age 25, murdered 12 people using several guns including a Smith & Wesson M&P15, with a 100-round drum.[39]

83.    Daniel Defense Deliberately Ignores the Human Harms and Losses Resulting from Its Deceptive and Unfair Marketing Practices.

84.    Daniel Defense knows their assault weapons land in the hands of mass shooters but deliberately stays ignorant to the number of killings and crimes caused by their weapons and their direct marketing to vulnerable and/or young adults. On the day of the Uvalde school shooting, Daniel Defense posted a photo of the gun used by the Uvalde school shooter with bullet proof body armor with the hashtags "gunsofinstagram" and "loadout."



---

[38] *Guns Used in San Bernardino Shooting Were Purchased Legally from Dealers*, Washington Post (Dec. 3, 2015); *Florida Shooter Had Extra Ammo at School, Fired for 3 Minutes*, Associated Press (Feb. 15, 2018).
[39] *Aurora Gunman's Arsenal: Shotgun, Semiautomatic Rifle and, at the End, a Pistol*, The New York Times (July 23, 2012).

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

85.     Daniel Defense does not do any studies evaluating the effects of their marketing on the health and well-being of Americans and chooses not to look at the cost to families and communities like Uvalde, Texas.  Daniel Defense believes they have blanket immunity against civil lawsuits under PLCAA,[40] discussed *infra*, and have no incentive to promote or implement reasonable and truthful marketing practices or to stop sales to young adult civilians.

86.     Daniel Defense's CEO and founder, Marty Daniel makes no apologies for his company's place in the marketplace and the benefits he gains from mass shootings. Mr. Daniel proudly told Forbes Magazine in 2017 his sales went up after the mass shooting at Sandy Hook Elementary in 2012. Like the Uvalde school shooter, the Sandy Hook shooter was a young adult, 20 years old.  Marty Daniel contributes substantiality to the campaigns of politicians who will ensure its assault weapons remain accessible to young adults like the Uvalde school shooter. Unlike other product manufacturers, Daniel Defense is consciously indifferent to the human harms and losses caused by their intentional sales and marketing practices.

87.     Daniel Defense could try to reduce the number of semi-automatic weapons and AR-15 style rifles sold to civilians and young adults but chooses not to.  Daniel Defense could stop marketing to and glamorizing guns to children and young adults and enact more prudent merchandising and marketing policies but chooses not to.  Daniel Defense could provide educational marketing to the public on why young adults should not buy its weapons but chooses not to.  It could analyze the crime and death caused by its weapons and their role in mass shootings but chooses not to.  Daniel Defense could be truthful in its advertising and stop using military and youth icons to increase sales but chose not to.

88.     Daniel Defense knows marketing to children and young adults is not in the public

---

[40] Protection of Lawful Commerce in Arms Act, 15 U.S.C. 7902 *et seq.*

Copy from re:SearchTX

interest and increases the risk of death to Americans and children.  Daniel Defense knows that doing so leads to mass shootings using their weapons.  Daniel Defense makes millions off the sale of assault weapons especially after a mass shooting. Daniel Defense consciously chooses profits over the safety and lives of Americans. In the years before the Uvalde school massacre, the Daniel Defense did nothing to curtail the marketing and sale of guns to American youth.  Its business practices are reckless, deliberate, intentional, unfair, unscrupulous, and needlessly endanger American children.  Daniel Defense's advertising practices are unlawful under federal law to the deceptive and unfair statements made therein.

89.     Daniel Defense knows its AR-15 style, semi-automatic rifles are unsuited for home defense, recreation, or casual use and possession. The origin of the AR-15 is the military M-16, specifically designed to kill multiple people fast.  Daniel Defense knows its strategy of marketing directly to youth enables untrained civilians as young as 18 years old the power and ability to inflict unparalleled human carnage on unarmed and unprotected civilians and children.  The Uvalde school shooter seamlessly bought the AR-15 style rifle directly from Daniel Defense via its eCommerce website and had it shipped directly to Uvalde, Texas. Daniel Defense has done nothing to protect Americans against their reckless marketing and business practices.

**E.   The School Shooting On May 24, 2022**

90.     The morning of May 24, 2022, the shooter sent a Facebook private message to a girl in Germany telling her he shot his grandmother in the head and would shoot up the elementary school.

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX



91.     After he shot his grandmother in the face, he left, stole her truck, and started driving the few blocks to Robb Elementary and crashed the truck into a ditch at 11:28 a.m.

92.     Gilbert and Maria Galegos live across the street from the shooter's grandmother on Diaz Street in Uvalde, Texas.  They were in the front yard when Ms. Gonzales was shot.  They saw her come out of her house bleeding and holding her face.  They called 911 located at Uvalde PD twice, first at 11:33 a.m., and a second time at 11:35 a.m. but no one answered.  No one from Uvalde PD responded to the shooting.

93.     Uvalde County Sheriff Ruben Nolasco arrived later at Ms. Gonzales' home having first gone to the wrong address and only after being flagged down by a motorist when he was responding to the shooter's crash near the school.[41]   Sheriff Nolasco radioed on the UCSO's system at 11:35 a.m. he

---

[41] Craig Garnett.  911 Calls from Diaz Street Not in UPD Phone Log, August 18, 2022 at 12.

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

was responding to a woman shot on Diaz Street.  Sheriff Nolasco chose to stay at the scene on Diaz Street, that was then under control, rather than go to the school to stop the shooter.

94.     At 11:27 a.m., Robb teacher, Emilia "Amy" Marin exited the school building via an exterior door in the west hall to retrieve food for a school party leaving the door propped open with a rock. The School District and its leaders let staff prop open doors for their convenience, in violation of its own safety protocols.

95.     At 11:28 a.m., the shooter crashed his grandmother's truck into a dry ditch near Robb Elementary.  Claudia Perez at Hillcrest Memorial Funeral home heard the crash and she and two funeral home co-workers, Cody Briseno and Gilbert Limones, went outside to help after calling 911 at 11:28 am to report the crash.  They approached the crash scene to render aid but ran back towards the funeral home when the shooter displayed a rifle and shot at them.  Cody Briseno called 911 a second time at 11:33 am.

96.     At 11:29:40 a.m., teacher Emilia Marin returned through the school's west entry exterior door kicking the rock from the door she propped open, then pulled it shut while she continued to look out of the exterior door as she frantically spoke on her cell phone.[42]  Ms. Marin tried to enter a door on the south side of the west hallway only to find it locked.[43]  She knocked on the door, and it was eventually answered by another female, whom she advised of the emergency.[44]  They moved into classrooms to secure their students.[45]  The door is a security door that is supposed to lock automatically when closed.

---

[42] Robb Elementary School Attack Response Assessment and Recommendations, June 30, 2022 ("ALERRT Report"); *see also* H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 46 (Tex. 2022) ("The surveillance camera inside the west building recorded that someone had propped open the west door with a rock earlier on May 24. *See* Robb Elementary surveillance video. Apparently in response to the lockdown alert, a teacher came into the hallway and removed the rock. *Id.* When the gunman arrived, the door was not propped open by a rock—but because the door was unlocked, he was still able to open the door and enter the building.")
[43] *Id.*
[44] *Id.*
[45] *Id.*

Copy from re:SearchTX

97.     At 11:30:14 a.m., the shooter, wearing dark clothing and carrying a bag, left the crash scene and climbed a five-foot chain-link fence onto the school property and walked across the open grounds between the fence and the teachers' parking lot towards the school buildings on the west side of the school campus.

98.     Robb Elementary Coach Yvette Silva was outdoors with a group of third graders, and she spotted the shooter's backpack being tossed over the school fence followed by a person dressed in black climbing over it. She then saw the person raise a gun and shoot. Coach Silva thought the shooter was shooting at her, and she ran from the field toward her classroom. She used her school radio to report: "Coach Silva to office, somebody jumped over the fence and he's shooting." She ran toward a group of third graders on the school playground, including Plaintiff G.R., to tell them to lock down. She expected to hear an announcement of a lockdown, but she did not hear one right away.[46] Meanwhile, the shooter went on to the fourth-grade teachers' parking lot, continuing to fire his gun.

99.     Robb Elementary Principal, Mandy Gutierrez, was in her office when she heard Coach Silva's report over the radio. Principal Gutierrez tried to start a lockdown on the Raptor application but had difficulty making the alert because of a bad wi-fi signal.[47] When there is a threat outside the buildings on the school grounds, the Texas Standard Response Protocol (SRP) requires school staff to initial an alert "Secure, Lock Out" to alert everyone to get inside and secure all outside doors.[48] If gun shots are heard, the SRP requires an immediate "Lockdown" announcement.[49] Mandy Gutierrez did not communicate the lockdown alert over the school's intercom. Instead, she called and spoke with Chief Arredondo, who said: "shut it down Mandy, shut it down."[50] She told head custodian Jaime Perez to

---

[46] Committee testimony of Coach Yvette Silva, Robb Elementary (June 16, 2022).
[47] DPS interview of Mandy Gutierrez, Robb Elementary Principal (May 27, 2022).
[48] *See* Texas School Safety Center, Standard Response Protocol, https://txssc.txstate.edu/videos/srp (last accessed November 10, 2022).
[49] *Id.*
[50] *Id.*

Copy from re:SearchTX

ensure all the doors were locked. At first, she locked down in her own office, but later moved to the cafeteria.[51]

100.    At 11:31:36 a.m., the shooter is seen on video walking between cars shooting, and a Uvalde PD unit is captured arriving at the crash site.[52]   At 11:31:43, a.m. a UCISD PD officer drove through the west gate near the crash site and across the field to the south side of the building at a high rate of speed.[53] The shooter was in the parking lot, but the UCISD PD officer did not see him due to his haste. [54]

101.    At 11:31 a.m. a teacher frantically called 911 telling dispatch, "He's shooting!"  Gun shots are heard in the background while the teacher, terrified, yelled repeatedly for the kids get to their classrooms.

102.    At 11:32:08 a.m. the shooter reached the west teachers' parking lot next to the building and fired shots through windows into the westmost classrooms before entering the building.

103.    At 11:33 a.m., the shooter entered the school through the back westside door that was unlocked.  The teacher who kicked the rock and shut the propped door, did not check to see that it was locked allowing the shooter easy access inside the school.[55]  Video showed the shooter open and enter the school building unabated.  The exterior doors on the east and south sides of the building were also unlocked so the shooter had several options for entry.[56]

---

[51]  Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022). Chief Arredondo told the Committee he had no recollection of talking to Principal Gutierrez. Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 161 (June 21, 2022).
[52]  *Id.*
[53]  *Id.*
[54]  *Id.* at 15.
[55]  ALERRT Report, at 15.
[56]  H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 46 (Tex. 2022).

Copy from re:SearchTX





Photos:  School Shooter Entering Robb Elementary.

104.    At 11:34 a.m., only one minute after the shooter entered, Defendant Sgt. Maldonado parked his TDPS car at Robb Elementary School.

105.    Twenty-four seconds after the shooter entered the school and walked down the hallway, he shot into the classrooms spraying over 100 bullets in 2 ½ minutes killing and injuring many innocent victims.  There were no School District police inside the school.  At 11:33:24 a.m., the shooter fired

Copy from re:SearchTX

rounds from the hallway toward classrooms 111 and 112.[57]  At 11:33:32 a.m., he entered classroom 111, which was unlocked.[58]  The rate of fire was initially very rapid then slowed, lasting only a few seconds.[59] The sound of children screaming was removed from video recordings released to the public.

106.     At 11:33:37 a.m., the shooter backed out of classroom 111 into the south hallway and fired shots from the hallway into classroom 112. The shooter then re-entered classroom 111 and continued the shooting spree.  The shooter fired over 100 rounds by 11:36:04 a.m., according to audio analysis.[60]

107.     Two minutes, 57 seconds after the shooting began, the first wave of law enforcement officers entered the school taking positions in the hallway north and south of classrooms 112 and 111. At 11:35:55 a.m. three Uvalde PD officers entered the school through the west exterior door into the west hallway.[61] The officers had external armor, two with concealable body armor, two rifles, and three pistols.

108.     At 11:36:00 a.m., four additional law enforcement officers arrived, including two Uvalde PD officers, a Uvalde PD SWATT team commander, and UCISD PD Chief Arredondo.  Chief Arredondo was at his office at the Uvalde High School when he heard "shots fired" on the radio. He rushed to Robb Elementary at 11:36 a.m., unprepared, carrying only a Glock 22 handgun.  He had no classroom keys, radio, or protective gear.  When he got to the school, he dropped his radios near the school fence because they bothered him.[62]  He arrived with another UCISD PD officer and two Uvalde PD officers.  They had three external body armor carriers, concealable body armor, and pistols.[63]

---

[57] Id.
[58] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 46 (Tex. 20 22).
[59] Id.
[60] Id.
[61] ALERRT Report, at 9.
[62]  Texas House Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).
[63] Id.

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

109.    Sheriff Nolaso still on Diaz Street was given the shooter's name by his grandmother, Ms. Gonzalez (11:38 a.m. according to body camera footage), which he did not share with the first responders.  It was not until 30 minutes later the shooter's name was passed along by Nolasco.

110.    Chief Arredondo was required by the School District's active shooter plan to set up an outside command post as the on-scene commander, but he did not. He told the House Committee:

> [W]hile you're in there, you don't title yourself … .I know our policy states you're the incident commander. My approach and thought was responding as a police officer. And so I didn't title myself. But once I got in there and we took that fire, back then, I realized, we need some things. We've got to get in that door. We need an extraction tool. We need those keys. As far as … I'm talking about the command part … the people that went in, there was a big group of them outside that door. I have no idea who they were and how they walked in or anything. I kind of – I wasn't given that direction.
>
> ***
>
> you can always hope and pray that there's an incident command post outside. I just didn't have access to that. I didn't know anything about that.[64]

111.    No officer from Uvalde PD assumed the role of incident commander either, even in the face of Chief Arredondo's failure to do so.  A central command away from the immediate action helps coordinate the law enforcement response and centralize and evaluate information and events as they come in to ensure it gets out to key responders on the front lines, and to make decisions and course changes as things develop.  Establishing an incident commander is essential for maintaining effective command and control.

112.    Lt. Pargas, the acting Chief of Uvalde PD, told the House Committee that, it was his understanding that officers on the north side of the building understood there were victims trapped inside the classroom with the shooter.  And although nobody said it, he, and the officers on the north side of the building were waiting for other staff from Department of Public Safety or BORTAC to arrive with better equipment like rifle-rated shields.

---

[64] Texas House Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

Copy from re:SearchTX

113.    Captain Joel Betancourt was 70 miles away from Uvalde when the shooting began. While driving to Robb Elementary, Betancourt called the mayor of the City of Uvalde and the Chief of the Uvalde Police Department, and then instructed TDPS officers on the scene that they should remain outside Robb Elementary and establish a perimeter.

114.    The portable radios used by UCISD PD and other law enforcement officers did not work inside the school building, and officers had to step 10 feet away from the school to receive signals. Radios used by Border Patrol agents did work but poorly.[65]

115.    Audio recordings confirm the shooter was actively firing his weapon until 11:36:04 a.m. Ava Mireles, who was killed called her husband, Ruben Ruiz, a UCISD PD police officer, to tell him she was shot and dying.  At 11:36 a.m. Officer Ruiz was seen checking his phone, then a few minutes later, heard telling the other officers his wife was shot. After Ms. Mireles was shot and called her husband, her phone slipped, and a female student grabbed it and called 911.  She called several times asking them to send the police.

116.    At 11:37:00 a.m. Uvalde PD officers converged on rooms 111 and 112 led by Lt. Martinez and Sgt. Eduardo Canales but retreated when the shooter fired.[66]  UCISD PD and Uvalde PD police did not make another attempt at the shooter for more than an hour, until U.S. Border Patrol officers arrived.[67]

117.    Around 11:41 a.m., more officers arrived, including officers from TDPS. Defendant Fire Marshal Hernandez entered the building carrying a rifle. Two of the officers on scene, Deputy Johnny Field, and Deputy Emmanuel Zamora, were instructors at the regional police academy. Another, J.J. Suarez, was a UCISD School Board member and, upon information and belief, a reserve officer of the

---

[65] Texas House Committee testimony of Texas Department of Public Safety Director Steve McCraw (June 21, 2022).
[66] ALERRT Report, at 15.
[67] *Id.* at 17.

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

UCISD-PD with more than a decade of law enforcement experience. All four entered the building.

118.    At 11:43 a.m., Chief Arredondo called for more firepower because he had only a pistol compared to the shooter's AR-15, 30-round magazines, and bags of ammunition.  He gave orders to officers to stand down while the shooter was actively shooting teachers and students trapped in classrooms 111 and 112.  The day after the shooting, Chief Arredondo confirmed on video camera that he chose not to following his shooter training:

> "Once I realized that was going on, my first thought is that we need to vacate. We have him contained - and I know this is horrible and I know it's [what] our training tells us to do but - we have him contained, there's probably going to be some deceased in there, but we don't need any more from out here."[68]

119.    Arredondo stuck with that choice for over an hour, even when he thought he heard the gunman reloading and after it was confirmed children were trapped - injured and alive as well as dead - with the shooter.[69] Audio recordings confirm shooting was ongoing: 11:40:58 a.m., the shooter fired a shot, at 11:44:00 a.m., the shooter fired another shot, and at 12:21:08 p.m., the shooter fired 4 more shots.[70] During each instance, the event was active requiring an immediate action plan. Video footage show hundreds of officers standing with firearms and tactical gear, body armor, and ballistics shields, but no one acted.  DPS records show Arredondo took required active shooter training at least three times, including in the December before the massacre. The specific course he took then instructs officers to "isolate, distract and neutralize" the attacker. It reminds officers "First responders to the active shooter scene will usually be required to place themselves in harm's way and display uncommon acts of courage to save the innocent."

120.    By 11:51:20 a.m., law enforcement from various agencies (including Uvalde PD, UCISD PD, Uvalde County Sheriff's Office Deputies, Fire Marshals, Deputies, Southwest Texas Junior College

---

[68]
[69] *Id.*
[70] ALERRT Report, at 17.

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

Police Department, and the U.S. Border Patrol) arrived.[71]  There were about 376 law enforcement officers at the school.[72]  Meanwhile, terrified students and teachers trapped inside classrooms with the shooter dialed 911.

121.   At 11:59 a.m. Chief Arredondo, contrary to active shooter protocol, tried to start negotiations with the shooter, who was still unknown to him.

122.   At 12:03 p.m., the first 911 call came from a female child. She called back several times over the next 13 minutes, telling officials there were multiple people dead at 12:16 p.m., she called back and said there was eight to nine students alive.

123.   At 12:19 p.m., a 911 call was placed by a student in an adjoining classroom. The child hung up when another student told her to hang up. Another Robb call came in three minutes later. On this one, the sound of three gunshots can be heard. Due to lack of communication among law enforcement and Chief Arredondo's and Lt. Pargas' failure to set up a command post, Chief Arredondo, and others inside were unaware of the 911 calls.

124.   At 12:21 p.m., after a 37-minute break in shooting, the shooter began firing again from inside the classroom. A team of law enforcement officers with rifles and tactical gear approached the classroom but made no attempt to enter the classroom. Among those that did not try to approach the classroom in response to the shots fired was Christopher Kindell of TDPS. He continued to confer with Border Patrol agents instead of rushing the classroom as active shooter protocol requires.

125.   At 12:30 p.m., Defendant TDPS Captain Betancourt arrived (he later told investigators he had not arrived until 12:45 p.m., which was false). Defendant Captain Betancourt instructed state police officers on site to remain outside and establish a perimeter, rather than rush inside, as active shooter protocol requires.

---

[71] ALERRT Report, at 8.

Copy from re:SearchTX

126.     At 12:36 p.m., the initial female student caller dialed 911 again. The student was told to "stay on the line and to be quiet."  The student told the dispatcher "He shot the door," and hung up after 21 seconds.  Minutes later, the child called to plead: "Please send the police now."

127.     The next 911 calls coincide with when U.S. Border Patrol officers entered the classroom — more than an hour after the shooter's arrival on campus — and shot him.  "At 12:51 p.m., it's very loud and it sounds like officers are moving children out of the room," according to DPS Director McGraw.  "By that time, the first child was out before the call cuts off."

128.     From 12:21:16 p.m. until 12:34:38 p.m., Chief Arredondo discussed tactical options and considerations including snipers, windows, a master key, and how to get into the classroom with a Uvalde PD officer. They also discussed who had the keys, testing keys, the probability of the door being locked, and if kids and teachers are dying or dead.[73] When the keys arrived, Chief Arredondo tried them, on a different door, but none worked.  He never asked the school principal, just feet away, or the head custodian for the master key. He was inside fumbling with keys when he should have been outside at a command post.  The House Committee investigation revealed that the door to classroom 111 was probably not locked.[74]

129.     By 12:48 p.m., a BORTAC-led group of officers was finally preparing to breach the door. However, Captain Betancourt came over the radio with a message: "Hey, this is D.P.S. Captain Betancourt. The team that's going to make breach, I need you to stand by." Thankfully, his message was ignored.

130.     At 12:50:03 p.m., 77 minutes after the massacre began, U.S. Border Patrol officers breached the door of Room 111 and fatally shot the shooter.[75]  The Border Patrol officers, using a

---

[73]ALERRT Report, at 9.
[74] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 71 (Tex. 2022).
[75] ALERRT Report, at 11.

Copy from re:SearchTX

ballistic shield, entered the classroom and shot and killed the shooter after local law enforcement officers, including UCISD PD and Uvalde PD officers waited outside doing nothing for nearly 50 minutes while children repeatedly called 911 pleading for help.  The shooter was standing in front of a closet in the corner of Room 111, and he fired his rifle at the stack of officers coming through the classroom door. The officers fired on the shooter killing him.

131.    Time was critical during a mass shooting involving AR-15s and high-capacity bullets, and any delay means loss of life due to blood loss. Every second someone is bleeding, decreases their chance of survival. Medical aid must be started immediately to prevent loss of life.  The average human body has 5-6 liters of blood. Children have proportionately smaller amounts. When the body loses about half of its normal volume, irreversible shock sets in and the body cannot survive regardless of the medical care it eventually receives. Time is crucial.  Teacher Elisa Avila in Classroom 109 was shot by a bullet that went through the wall.[76] A pediatrician who treated the victims described small bodies "pulverized" and "decapitated." The bodies of several victims, disfigured beyond recognition, were identified by their DNA; one 10-year-old victim's body was identified based on her green Converse sneakers.[77]

### F.    The Gun Defendants Are Not Shielded By The Protection Of Lawful Commerce In Arms Act ("PLCAA") Because They Violated Federal Laws.

132.    The Gun Defendants cannot abate any responsibility for this massacre and a hide behind the Protection of Lawful Commerce in Arms Act, 15 U.S.C. Sec. 7901, *et. seq.* ("PLCAA").  PLCAA is a federal law that prohibits injured parties from suing gun manufacturers or dealers for personal injuries

---

[76] Texas House Committee testimony of Elsa Avila, Robb Elementary teacher (June 30, 2022).

[77] Nicholas Bogel-Burroughs, An Uvalde pediatrician says he will 'never forget what I saw' after the shooting, N.Y. Times (June 8, 2022), www.nytimes.com/2022/06/08/us/uvalde-pediatrician-shooting.html;Jaclyn Diaz, The story of a Uvalde victim's green shoes captures the White House's attention, NPR (June 7, 2022), https://www.npr.org/2022/06/07/1103577387/matthew-mcconaughey-green-converse-shoes-sneakers-uvalde-maite-rodriguez.

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

only caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.  PLCAA, however, is unconstitutional, in violation of the Tenth Amendment of the U.S. Constitution.

133.    Assuming PLCAA is constitutional and applies to Plaintiffs' claims, PLCAA is not an absolute bar, but an affirmative defense.  The conduct at issue is precisely the type excepted from PLCAA.  PLCAA allows narrow protection from some claims, while expressly permitting other claims based on the unlawful or negligent actions of the gun dealer or manufacturer, or **violation of a state or federal statute applicable to firearms.**  Here, the Gun Defendants violated federal law in two respects.

134.    First, they negligently transferring and selling firearms to the shooter in violation of 15 U.S.C. § 7903(5)(B).  The Gun Defendants sold the AR-15 style rifles, ammunition, and accessories to the shooter when they knew or should have known he was likely to, and did, use the weapons in a way involving unreasonable risk of physical injury to others.  *See* 15 U.S.C. § 7903(5)(B).

135.    Second, they falsely, unfairly, and deceptively marketed weapons to consumers in violation of the Federal Trade Commission Act, 15 U.S.C. §§ 41-58, as amended (the "FTC Act").  The FTC Act, a predicate exception to PLCAA, prohibits false, deceptive, misleading, and unfair advertising practices.  Defendants' marketing and advertising practices not only are false, misleading, and deceptive, but they promote injury, violence, death, and illegal use and conduct in violation of the FTC Act.

136.    Daniel Defense's used images of children holding its AR-15s, which is not only boldly promoting illegal conduct, but is unscrupulous, reckless, and outside the bounds of all decency in the consumer marketplace and society.  Daniel Defense's marketing and advertising was directed to children, adolescents, and young adults who they know are vulnerable, inexperienced, still undergoing important cognitive development, and most easily manipulated.   Daniel Defense specifically targeted

Copy from re:SearchTX

young consumers knowing this group is not emotionally, biologically, or physiologically equipped to handle the grave responsibility of owning or using a lethal semi-automatic weapon capable of injuring and killing others with precision and without any training.  Daniel Defense's marketing and advertising did not disclaim that buy, handling, and use by children, adolescents, and young adult consumers was hazardous to public health and safety, a nuisance, encourages violence, and likely to lead to injury and death.

137.    The FTC Act encompasses the acts of the Gun Defendants because they not only intentionally deceived consumers with their marketing, but they promoted, encouraged, and glamorized unsafe and illegal conduct via unscrupulous aggressive marketing that causes injury and death.   The FTC itself has construed the FTC Act as prohibiting practices that are physically dangerous to consumers. *Soto v. Bushmaster Firearms Int'l*, LLC, 331 Conn. 53 (Conn. 2019); *see also* J. Beales III, "*Advertising to Kids and the FTC: A Regulatory Retrospective That Advises the Presen*t," 12 Geo. Mason L. Rev. 873, 876 (2004). The FTC has, on multiple occasions, found violations of the FTC Act when companies have advertised or promoted their products in a way that is likely to result in physical injury, even without product sales. *Id.*  As discussed *infra,* the Gun Defendants' marketing and advertising practices violated the FTC Act, which is a predicate exception to PLCAA.  The Gun Defendants are not entitled to dismissal under PLCAA.

## VI.  FIRST CAUSE OF ACTION: NEGLIGENCE

138.    Plaintiffs realleges and incorporates each of the preceding paragraphs, and all subsequent paragraphs.

139.    The Gun Defendants had a duty to market and sell their products in manner not to expose others to reasonably foreseeable risk of harm.

140.    The Gun Defendants had a duty to market and sell their products in a truthful way and not mislead and deceive consumers about the features, qualities, approval, and sources of their products.

Copy from re:SearchTX

141.    The Gun Defendants had a duty to market their products, which they knew were dangerous in the hands of young civilians, in a reasonable and prudent manner.

142.    The Gun Defendants further had a duty to exercise reasonable care in selling, offering for sale, selling, marketing, and shipping its firearms, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

143.    The Gun Defendants had a duty to tell the ATF and register the AR-15 purchased by the shooter as a machine gun meeting the ATF criteria.  The Gun Defendants chose to design and sell the Daniel Defense DDM4 V7 with features that let it be easily changed to fire automatically, but made, transferred, and sold the gun in violation of the NFA and the Gun Control Act ("GCA").   The Gun Defendants did not complete the proper transfer forms, get approval of the forms by the ATF, pay occupational and transfer taxes and register the firearms with ATF in violation of federal law.  The Gun Defendants, and each of them, breached their duty of care and did not act as a reasonable weapons manufacturer and seller would in similar circumstances by failing to be truthful in their marketing and selling practices and failing to report the gun as a qualified fully automatic machine gun.

144.    The Gun Defendants, and each of them, breached their duty of care to market and sell their products in manner not to expose others to reasonably foreseeable risk of harm.  The Gun Defendants did not take steps to prevent sales of their weapons to consumers such as the school shooter, reasonably foreseeable to use, and did use, the weapons to harm others.

145.    The Gun Defendants did not act as a reasonable marketer and seller would in similar circumstances, by failing to be truthful in their marketing and by directly targeting classes of consumers known to misuse their products and for criminal purposes to harm others.

146.    Daniel Defense's advertising encourages the illegal and dangerous misuse of AR-15-style rifles.  Daniel Defense marketing its AR-15s to the civilian market, including via social media, with

Copy from re:SearchTX

violent and militaristic imagery, unfairly and illegally implying that civilians can use the weapons for offensive combat-like missions.  Daniel Defense's advertising is intended to appeal particularly to the thrill-seeking and impulsive tendencies of susceptible adolescents and young men who are attracted to violence and military fantasies.

147.    Daniel Defense's advertising practices were infused with military imagery and symbolism and had statements and omissions likely to mislead consumers acting reasonably under the circumstances to their detriment.  Daniel Defense's advertising had false representations their weapons have military and/or government use, approval, acceptance, sponsorship, and features, which they do not.

148.    Daniel Defense affirmatively marketed itself as a military weapons supplier and represented to consumers via print, social media, and online advertising that its weapons were used and approved by the military, when they were not.  Daniel Defense's advertising depicted combat scenes, military operations, and soldiers telling consumers to "Use What They Use," yet Daniel Defense has no firearm weapons supply contracts with the military as they delibately and falsly lead consumers to believe.  Daniel Defense sold handrails to the military, a weapons' accessory, not the firearms depicted in their advertising.  Despite the clear statements by Daniel Defense their weapons are used or endorsed by the military, about 90 percent of their sales are to civilians.  Daniel Defense's statements to consumers declaring their firearms are "tested, proven, and chosen" by the military were negligent, false, misleading, and unfair to consumers in vioation of the FTC Act.[78]

149.    Daniel Defense's negligent false, misleading, and unfair representations, statements, and omissions in their advertising were material and intended to induce consumers to buy the weapons.

---

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

Daniel Defense knew that creating clout, power, and prestige around a product is essential to induce a consumer to buy a product. For weapons' consumers, there is nothing more prestigious than carrying the same weapon carried by the elite military whose task is to defend the country.

150.    Daniel Defense represented in their advertising their weapons are "tested and chosen" by the military but this was not true.  Daniel Defense did not inform consumers of the truth, or that it only had military contracts to sell handrails, not weapons.  Daniel Defense's military-infused marketing and advertising campaigns were false, deceptive, misleading, and unfair to consumers in violation of the FTC Act.

151.    Daniel Defense's marketing and advertising was directed to children, adolescents, and young adult consumers who they knew were vulnerable, inexperienced, and more easily manipulated. Daniel Defense promoted use of its firearms by to children, adolescents, and young adult consumers leading them to believe the firearms were safe for use by them.  Daniel Defense specifically targeted this consumer group knowing this group is not emotionally, biologically, or physiologically equipped to handle the grave responsibility of using a lethal semi-automatic weapon capable of injuring and killing others.  Daniel Defense's marketing and advertising did not disclaim that buy, handling, and use by children, adolescents, and young adult consumers was hazardous to public health and safety, encourages violence, and likely to lead to injury and death to the consumer and others.

152.    Daniel Defense's marketing and advertising used popular youth culture themes and icons to attract and exploit children, adolescents, and young adults. Daniel Defense used photographs of children holding AR-15s and images of first-person shooter games, *Call of Duty* and *Fortnite,* and youth icons such as *Star Wars* to target young users through social media posts.  Daniel Defense specifically targets this group knowing this consumer group is unqualified by age or experience to expect or appreciate the possibility the representations may be exaggerated or untrue, or the likelihood of harm or

Copy from re:SearchTX

death to others.  Moreover, there was no caution or disclaimers to the young audience warning them the weapons are not intended for physiologically immature consumers.   While military and law enforcement personnel who use AR-15 rifles are highly trained, Daniel Defense knew the children, adolescents, and young adults it targeted had no such training and no use for such firearms.

153.   Daniel Defense marketed its firearms to children, adolescents, and young adults with images of live combat scenes to promote violence, death, and unsafe and illegal conduct.  Daniel Defense did not age restrict its website and takes no action to restrict access to his violence promoting content.

154.   Daniel Defense's uses images of children holding its AR-15s, which was not only boldly promoting illegal conduct, but was unscrupulous, reckless, and outside the bounds of all decency in the consumer marketplace.

155.   Daniel Defense's advertising was intended to attract adolescents and young adults knowing this consumer group was more likely to use their weapons irrationally and to harm others given their age, biological development, and history of use in mass shootings.

156.   The shooter's purchase and illegal use of the Daniel Defense DDM4 V7 was a direct result and foreseeable consequence of Daniel Defense's deceptive, misleading, and unfair marketing tactics.  Daniel Defense's conduct was and continues to be negligent, and this negligence was a proximate cause of the Plaintiffs' injuries.

157.   Daniel Defense's conduct of knowingly engaging in deceptive, misleading, and unfair trade practices violated and continues to violate the Federal Trade Commission Act, 15 U.S.C. § 45(a).

158.   Daniel Defense's marketing practices are unfair because they encouraged and continue to encourage the illegal misuse of their AR-15-style rifles and further because they misrepresent the source, characteristic and sponsorship of the products.

Copy from re:SearchTX

159.     Daniel Defense's advertising and selling practices foreseeably caused or were likely to cause substantial injury to foreseeable victims of gun violence such as Plaintiffs.

160.     Oasis Outback had a duty to not to sell the AR-15s, ammunition, and accessories to the 18-year-old Uvalde shooter it knew, based on actual and constructive knowledge, had the features of a school shooter, and was suspicious and likely to harm himself or others.  Oasis Outback, its owner, and staff, knew, or should have known, due to the shooter's age, inexperience, appearance, demeanor, and display of young school shooter characteristics, the shooter intended to use the guns and ammunition to harm others and in fact did so.  Oasis Outback is a licensed seller of firearms.

161.     Oasis Outback had a duty to tell the ATF about the sale of over $3000 in guns ammunition including two ARF-15 rifles to a nervous and suspicious 18-year-old who visited the store three times in four days.

162.     Oasis Outback breached its duty of care and did not act as a reasonable weapons manufacturer and seller would in similar circumstances. Oasis Outback's acts and omissions were negligent, and this negligence was a proximate cause of the Plaintiffs' injuries.

163.     As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of childhood, and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and reduced income capacity, and that will continue into the future.

## VII.  SECOND CAUSE OF ACTION:  NEGLIGENT TRANSFER

164.     Plaintiffs realleges and incorporates each of the preceding paragraphs, and all subsequent paragraphs.

165.     The Gun Defendants had, at all relevant times, actual or constructive knowledge the AR-15 style rifles sold to the shooter had no reasonable application to lawful uses of firearm (such as military or self-defense) but instead were well-suited and/or intended for misuse.

Copy from re:SearchTX

166.    The Gun Defendants had, at all relevant times, actual or constructive knowledge that young adult males were most commonly the perpetrators of mass shootings, including school shootings, and had actual knowledge of the Uvalde school shooter's date of birth and gender.

167.    Oasis Outback, the store owner, and its staff, had actual knowledge of the Uvalde school shooter's characteristics and dangerous propensities.  Oasis Outback sold two AR-15 style rifles and 375 rounds of ammunition to the shooter on May 17, May 18, and May 20, 2022, and installed a holographic sight on the Daniel Defense AR-15 rifle the shooter used in the shooting.  Another witness described the shooter's all black clothing as simply giving off "bad vibes."  Despite the shooter's young age, inexperience, appearance, display of dangerous characteristics, and profile of a young adult school shooter, Oasis Outback sold the AR-15 rifles and ammunition to him just days after his 18th birthday.  Oasis Outback, its owner, and staff, knew, or should have known, due to the shooter's age, inexperience, appearance, demeanor, and display of young school shooter characteristics, the shooter intended to use the guns and ammunition to injure and kill people.

168.    All Defendants had a duty not to transfer a lethal weapon to a person having and/or displaying dangerous propensities or indicating a propensity to harm and kill others.  Oasis Outback had a duty not to transfer the AR-15 used in the school shooting to the shooter given its actual and constructive knowledge the shooter intended to use the gun for harm to others.

169.    As a proximate cause of the Gun Defendants' negligent transfer of guns, ammunition, and accessories to the shooter, the shooter was able to acquire and misuse the weapons causing the school massacre on May 24, 2022.  The Uvalde school shooting was a foreseeable consequence of the Gun Defendants' negligent transfer of the weapons to the shooter.

170.    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment

Copy from re:SearchTX

of childhood, and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and reduced income capacity, and that will continue into the future.

### VIII.    THIRD CAUSE OF ACTION:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

171.    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

172.    Defendants' conduct acts and omissions, conscious choices, and deliberate indifference to Plaintiffs as alleged throughout this Complaint were intentional and done with reckless disregard for Plaintiffs' health, well-being, safety, and lives.

173.    Defendants' conduct was extreme, outrageous, atrocious, and intolerable in a civilized community. Defendants knew or should have known that their conduct, acts and omissions, and choices would create a high degree of risk of harm to Plaintiffs.  Defendants knew the Plaintiffs' vulnerabilities and susceptibility to harm given their age.   Despite this knowledge, Defendants deliberately proceeded to act, and did not act, in conscious disregard of and with indifference to that risk.

174.    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer severe emotional distress including fear, apprehension, terror, anxiety, panic, worry, stress, night terrors, insomnia, stress induced health effects, post-traumatic stress syndrome, mood disorders, behavioral changes, and loss of security and peace.  The depth, intensity, and duration of the mental distress and emotional pain suffered by Plaintiffs is not ordinary, and not what children should have to endure due to the intentional and reckless conduct of the Defendants.

175.    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of childhood, and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and reduced income capacity, and that will continue into the future.

Copy from re:SearchTX

## IX.  **FOURTH CAUSE OF ACTION:  NUISSANCE**

176.     Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

177.     A private nuisance exists in Plaintiffs' community due to the Gun Defendants' negligent, intentional, and reckless marketing and sale of AR-15 style rifles to young adults and civilians in Uvalde, Texas for the purpose of causing terror, harm, and death in Plaintiffs' community.  The Gun Defendants' conduct caused and continues to cause emotional and physical harm to Plaintiffs in innumerable ways by creating fear, apprehension and reducing Plaintiffs' sense of security, peace, and enjoyment of life in their own homes and property in addition to the needless loss of life.

178.     Plaintiffs have an interest in the safe, secure, and peaceful use and enjoyment of their homes and property in Uvalde, Texas.  The Gun Defendants took these rights by marketing and selling AR-15 style rifles in Plaintiffs' community, knowing the consequences of their conduct, and foreseeable loss of life and enjoyment of peace, safety, serenity, and security to Plaintiffs.

179.     Daniel Defense is in the business of researching, testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting AR-15 style rifles, including those used by the Uvalde school shooter.

180.     Oasis Outback is a Uvalde, Texas sporting goods store that markets and sells AR-15 style rifles, accessories, and ammunition to young adults and civilians in Plaintiffs' community.  On May 17, 2022, the Uvalde school shooter bought a Smith & Wesson M&P15 AR-15 style rifle from Oasis Outback.  On May 18, 2022, he returned to Oasis Outback to buy 375 rounds of M193, 5.56 55-grain round with full metal jacket ammunition.  On May 20, 2022, the shooter returned to Oasis Outback to pick up the DDM4 V7 rifle he bought online from Daniel Defense and used in the Uvalde school shooting. AR-15 style rifles can carry drums or magazines containing up to 100 rounds of ammunition. These rifles can be changed legally to increase the firing rate to the speed of a fully automatic machine

Copy from re:SearchTX

gun that is illegal for civilians. The AR-15 style rifles are dangerous to humans and people living in a community.  AR-15 style rifles destroy human bodies, limbs, organs, and tissue, pulverize the human body, explode, and cause immediate death.  The only purpose of the rifles is to kill as many as possible in little time The AR-15 style rifles are not suitable for civilian use and have no utility in the hands of a young untrained adult civilian living in a community such as Plaintiffs.

181.     The Gun Defendants' marketing and sale of AR-15 style rifles in Plaintiffs' community created and continues to create fear, apprehension, terror, injury, loss of life, peace, security, enjoyment, and peace in Plaintiffs' homes and community.

182.     The Gun Defendants' only interest in Plaintiffs' community is profit. Except for the gun store, the Gun Defendants have no relationship to Uvalde other than profiting off firearm sales to civilians.  In furtherance of the Gun Defendants' financial interest in Uvalde, the Gun Defendants directly markets to young adult and civilian consumers in Plaintiffs' community with the intent to make money off the community and distribute their weapons for use in the community.

183.     The Gun Defendants knew that selling AR-15 style rifles, accessories, and ammunition to young adults and civilian in Plaintiffs' community would cause fear, apprehension, terror, injury, loss of life, peace, security, enjoyment, injury, and peace to Plaintiffs.  The Gun Defendants marketed and sold AR-15 style rifles, accessories, and ammunition to young adults and civilians in Plaintiffs' community they knew were not competent or capable of using the firearms safely. For example, Daniel Defense admitted its firearms should not be handled and used by children or untrained civilians. The Gun Defendants knew their AR-15 style rifles' only purpose was to kill yet they marketed and sold them to young adults and civilians anyway.  There is no utility in marketing and selling lethal guns such as AR-15 style rifles and trigger modifications to young adults in Plaintiffs' community.

184.     The Gun Defendants had no processes in place to stop the marketing or sale of AR-15

Copy from re:SearchTX

style rifles to young adults and civilians in Plaintiffs' community.  Defendants could educate the community and potential consumers of the dangers of use by young adult civilians but chose not to. Defendants could set age restrictions, or training requirements for its firearms, but chose not to. Defendants could stop the sale of AR-15 style rifles to young untrained civilians but chose not to.  The Gun Defendants have no processes, guidelines, or procedures in place to reduce or eliminate the physical and emotional harm to Plaintiffs caused by the Gun Defendants' marketing and sales practices in Plaintiffs' community.  Defendants knew marketing and selling lethal guns, accessories, and trigger modifications resulted in community violence and increased children's risk of injury, death, anxiety, depression, trauma, and other psychological and physical affects.

185.    The Gun Defendants' marketing and sales strategies were the result of intentional decisions to directly market to young adults and civilians in Plaintiffs' community, including the shooter, without regard for the interests of Plaintiffs in the peaceful use and enjoyment of their homes and property.  Defendants' interests were purely for profit, above the safety, wellbeing, interests, and lives of Plaintiffs.

186.    As a result of the Gun Defendants' marketing and selling practices, the shooter bought AR-15 style rifles, accessories, and ammunition directly from Defendants and used the weapons to terrorize, injure, traumatize, and kill Plaintiffs and people in Plaintiffs' community.

187.    The Gun Defendants knew or should have known that directly marketing and selling distributing AR-15 style rifles to young adults and civilians in Plaintiffs' community involved an extreme degree of risk of interfering with or causing an invasion of Plaintiffs' interest in the safe, secure, and peaceful use and enjoyment of their homes and property.

188.    The Gun Defendants were aware that AR-15 style rifles were used by young adults and civilians in mass shootings.  It was foreseeable to the Gun Defendants the AR-15 style rifles purchased

Copy from re:SearchTX

by the 18-year-old shooter would be used to terrorize, injure, traumatize, and kill Plaintiffs and people in Plaintiffs' schools and community.  Despite this knowledge, the Gun Defendants sold the rifles to the shooter and others in Plaintiffs' community and continue to do so without regard for the rights of Plaintiffs.

189.    The Gun Defendants' marketing and sale of AR-15 style rifles to young adults and civilians in Plaintiffs' community interfered with and invaded the Plaintiffs' interest in the peaceful use and enjoyment of their homes and property and creates a nuisance causing Plaintiffs' reasonable fear, apprehension, trauma, injury, and terror in the peaceful use and enjoyment of their homes and property. The Gun Defendants' conduct in creating the nuisance and invading Plaintiffs' interests was negligent, reckless, and intentional.

190.    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of childhood, and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and reduced income capacity, and that will continue into the future.

191.    The Gun Defendants' conduct, as described above, was aggravated, outrageous, unreasonable, evil, and beyond all sensibilities. The Gun Defendants market and sell, and continue to market and sell, AR-15 style rifles for use in Plaintiffs' community knowing the dangerous propensities, kill purpose, and history of killings in Plaintiffs' and others' schools and communities.  The Gun Defendants, by their reckless and outrageous practices regularly puts Plaintiffs at risk of terror, fear, apprehension, injury, loss of life, peace, security, enjoyment, and peace with full knowledge that their practices put their profits over the safety and interests of Plaintiffs.

## X.    FIFTH CAUSE OF ACTION: UNJUST ENRICHMENT

192.    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent

Copy from re:SearchTX

paragraphs.

193.   Defendant Daniel Defense was unjustly enriched and kept the increased profits it received as a result of the Uvalde school shooting.  Defendant's conduct including negligence and gross negligence, false, deceptive, misleading, and unfair trade marketing practices, and other causes of actions set forth in this Complaint were the proximate cause of the shooter's access and purchase of weapons used to injure Plaintiffs.

194.    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of childhood, and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and reduced income capacity, and that will continue into the future.

## XI.   PUNITIVE/EXEMPLARY DAMAGES

195.   Each Defendant's conduct was done with reckless disregard for human life, oppression, and malice. Defendants, and each of them, were aware of the serious and demonstrable risk of serious bodily injury and death associated with their conduct and that such risks are compounded and worsened by their intentional inaction.  With full knowledge of such risks, Defendants proceeded causing Plaintiffs to suffer and sustaining severe physical, mental, and emotional harm.

## XII. RELIEF SOUGHT

196.   Wherefore, Plaintiffs respectfully request that Defendants be cited to appear and answer and that upon a final hearing of this case, a judgment be entered for the Plaintiffs against Defendants, jointly and severally, and that Plaintiffs be awarded damages for:

> a.   Physical pain and suffering, sustained in the past and physical pain and suffering that, Plaintiff Gonzalez will reasonably suffer in the future;
>
> b.   Mental anguish sustained in the past and mental anguish that, Plaintiff Gonzalez will reasonably suffer in the future;

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX

    c.  Physical impairment sustained in the past and physical impairment that, Plaintiff Gonzalez will reasonably suffer in the future;

    d.  Loss of enjoyment of life sustained in the past, and loss of enjoyment of life that Plaintiff Gonzalez will reasonably sustain in the future;

    e.  Medical expenses sustained in the past, and medical expenses that Plaintiff Gonzalez will reasonably sustain in the future;

    f.  Disfigurement of sustained in the past and disfigurement that Plaintiff Gonzalez will reasonably suffer in the future;

    g.  For Plaintiff, Rolando Valle Reyes, the loss of consortium of the love and companionship of Celia Martinez Gonzalez;

    h.  Exemplary damages;

    i.  pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate wed by law;

    j.  post-judgment interest at the legal rate;

    k.  costs of court; and

    l.  such other and further relief to which the Plaintiff may be entitled at law or in equity.

## XIII.   DEMAND FOR JURY TRIAL

197.   Plaintiffs respectfully demand a trial by jury.

## XIV.   SPOLIATION

198.   Plaintiffs require and demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the Uvalde school shooting or other violations made the basis of the Complaint and the alleged damages, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence. Failure to maintain such

Copy from re:SearchTX

items will constitute "spoliation" of evidence, which will necessitate use of the spoliation inference rule–

an inference or presumption that any negligent or intentional destruction of evidence was done because

the evidence was unfavorable to the spoliator's case.

Dated:  May 24, 2024.

WISNER BAUM

/s/ *Stephanie Sherman*
Stephanie Sherman
Texas State Bar No. 24006906
ssherman@baumhedlundlaw.com
Monique Alarcon (*pro hac vice to be filed*)
California State Bar No. 311650
malarcon@baumhedlundlaw.com
11111 Santa Monica Boulevard, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

LAW OFICE OF SHAWN C. BROWN
Shawn C. Brown
Texas State Bar No. 24003613
shawn@shawnbrownlaw.com
540 S. St. Mary's Street
San Antonio, TX 78205
Telephone: (210) 224-8200
Facsimile: (210) 224-8214

*Attorneys for Plaintiffs*

PLAINTIFFS' ORIGINAL COMPLAINT

Copy from re:SearchTX